PETER F. CARR, *pro ami.*, *vs.* AMERICAN LOCOMOTIVE CO.

PROVIDENCE—MAY 25, 1904.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1)  *Negligence.  New Trial.*

In an action for injuries sustained by plaintiff through alleged negligence of defendant, due to failure to provide safe appliances, evidence considered, and held not to sustain verdict for plaintiff.

(2)  *Negligence.  Evidence.*

In an action for negligence in not providing safe appliances, it was error to permit a witness for plaintiff to testify about an appliance other than the one alleged to have been defective, for the purpose of showing the faulty construction of the latter.

(3)  *Negligence.  Evidence.*

In an action for negligence in not providing safe appliances, evidence of certain experiments made with similar appliances to show the effect of the acts alleged as negligence is admissible and the appliances are properly offered in evidence as exhibits.  Permission to perform experiments in the presence of the jury is not a matter of right, but is within the discretion of the presiding judge.

(4)  *Negligence.  Safe Appliances.  Charge to Jury.*

In an action for negligence in not providing safe appliances, a charge that defendant was not bound to furnish the safest or newest or any particular kind of appliance except such as are in common use by ordinarily prudent and careful men under like circumstances, and that if the jury found that at the time of the accident the appliance used was in use by ordinarily prudent and careful men under like circumstances it would not be negligence to put such appliance in use, is a correct statement of the law.

TRESPASS ON THE CASE for negligence.  Heard on petition of defendant for new trial, and granted.

DOUGLAS, J.  This is an action on the case for damages sustained by the plaintiff through the alleged negligence of the defendant corporation.

The facts, as appears from the statement of evidence, are as follows:

(1)  On the 28th day of June, 1902, the plaintiff, who was then eighteen years of age, was operating an oil-burning rivet heater in the defendant's works, in Providence.  He had been in the

employ of the defendant nearly a year, and was familiar with the operation of the heater. The rivet heater was a cylindrical furnace about 3 feet 6 inches in diameter and about 2 feet from top to bottom, set with its plane surfaces parallel to the floor, and stood on iron legs which were about 3 feet long. There was an opening in the side of the furnace about 8 inches by 12 inches, for the purpose of putting in and taking out rivets, and a short distance from this opening was another round opening about 1½ inches or 2 inches in diameter through which the oil spray was thrown from the burner into the furnace. Between the two openings in the furnace there was a guard plate about 12 inches by 16 inches, which stood out at right angles with the side of the furnace. The oil used in the heater was crude petroleum, and was supplied under pressure from a tank in the ground a long distance from the furnace.

In order to use the oil in the furnace it was necessary to break the oil up into a spray. This was done by mixing it with air under pressure. The point of the burner through which the oil and air passed to the furnace was set about 1½ inches or 2 inches from the round hole in the furnace. A pipe ran from the oil tank to the burner, and another pipe from an air compressor to the burner. In the pipe leading from the oil tank, and about 9 inches below the burner, was a valve called a guard valve, which, when closed, shut off the supply of oil to the furnace entirely. In the pipe leading from the air compressor, and about 8 inches above the burner, was another valve which, when closed, shut off the supply of air entirely. In that part of the burner which was furthest from the furnace, and in a line with the round opening into the furnace and the point of the burner, was a valve which was used for adjusting the supply of oil to the furnace while it was in operation. The air when the furnace was in operation passed down from the air valve to the burner and through a passage in the burner, separated from the oil passage, and mixed with the oil at a point just inside the end of the burner, striking against the stream of oil in such a manner as to break it up into a spray, exactly as a liquid is projected in spray from an ordinary atomizer. The pressure per square inch on the oil was usually

from 20 to 23 pounds and never exceeded 40 pounds. The pressure on the air per square inch ranged from 40 pounds to 90 pounds. It required 8½ turns of the stem of the middle valve to release it from the threads in the valve, after which it would be held more or less tightly by the packing in the stuffing-box. The stem originally had been provided with a wheel for convenience in opening and closing the valve, but this wheel, some time before the accident, had been replaced with a cross-bar, so that the stem with the cross-bar attached was shaped like the letter T, and the stem could be screwed entirely out of the valve without unscrewing any other part of the valve.

Shortly after seven o'clock on the morning of said 28th day of June, the plaintiff testified that he started the fire in the furnace as usual, and while he was adjusting the flow of oil by means of the valve in the burner, the stem of this valve blew out, permitting the oil to spurt in an opposite direction from the furnace, and upon him. The oil on the plaintiff's clothing caught fire, and he was terribly burned. The plaintiff swore that at the time of starting up the fire the burner valve was closed, that three turns of the valve stem would supply all the oil needed, and that he was certain that he did not open the burner valve more than three turns of the valve stem.

The plaintiff alleges the breach of defendant's duty to provide safe machinery, appliances, and place to work, as follows: " Then and there unlawfully, negligently, and carelessly suffered and permitted its certain appliances, to wit, *a tap or stop-cock* then and there upon and *part of a certain feed-pipe* through which certain oil was fed or supplied to a certain rivet-heating apparatus then and there run, used and operated by the plaintiff, to become and be in a dangerous, improper and unsafe condition, and perilous to the safety and health of the plaintiff in that the same was of *insufficient strength to bear and stand the usual and necessary strain thereon* in using and working with the same, and in that the said *feed-pipe*, and the said *tap or stop-cock* provided for regulating and controlling the supply of oil therefrom, were improperly, insecurely, and *negligently fastened and joined together*, and in

that the *same* was *worn, weak and out of repair,* and was likely to break and escape from its proper position in consequence thereof, and to permit said oil . . . to escape in consequence thereof and thus become ignited and strike the operator and cause injury, etc."

In short, the declaration alleges that:

1. The stop-cock was of insufficient strength to bear the usual strain.

2. The feed-pipe and the stop-cock were improperly fastened together.

3. The stop-cock was worn, weak, and out of repair, and likely to break and escape from its position.

No evidence was introduced in support of the first proposition, except as it may be involved in the third.

The second was based upon evidence that valves were in use in which the stem was so constructed that it could not be entirely withdrawn from the valve without unscrewing the packing-box and taking the valve apart. This fact was shown to be no ground for attributing negligence to the defendant, because valves constructed like the one in question are in common and general use in gas furnaces, for a similar purpose, by prudent and careful manufacturers.

Much evidence was introduced relating to the condition of the valve stem which regulated the flow of the oil. The plaintiff attempted to show that the thread upon it had been worn and its holding power impaired by long use, and particularly by the process of riveting upon the end of the stem the bar of iron which was affixed in place of the wheel which was originally upon it for a handle.

Evidence was also introduced from which it might be inferred, and it was strenuously argued, that the accident was caused by an explosion of gas generated by the oil and collected in the pipe and burner.

It was also intimated that the valve and stem had been tampered with before being produced in court as an exhibit.

The plaintiff's main reliance to the jury was the supposition that the engagement between the threads of the stem and the corresponding threads of the valve box was so slight that the

expansion of the metal from the heat of the flame neutralized it completely and destroyed the holding capacity of the screw threads so that when an explosion occurred the stem yielded to the force and was expelled from the valve.

The jury found the defendant corporation guilty as charged in the declaration, and assessed the plaintiff's damages at $18,000 and they further found, on the special issues presented to them:

That the thread on the stem of the burner valve operated by the plaintiff at the time of the accident was not then in good working condition; that the thread in the body of the burner valve operated by the plaintiff at the time of the accident was not then in good working condition; that the valve stem produced in court, as a part of the burner valve in question and forming a part of defendant's Exhibit A, was the stem operated by the plaintiff at the time of the accident; that the burner and burner valve produced in court as part of defendant's Exhibit A were the burner and burner valve operated by the plaintiff at the time of the accident; and that the accident to the plaintiff was not due to the formation and explosion of gases in the pipe which supplied the furnace with oil.

The defendant now brings its petition for a new trial on the grounds:

1.   That the general verdict and the first two special findings of the jury were against the evidence.

2.   That the presiding justice erred in permitting the plaintiff to challenge one in every four jurors called, including those excused for cause.

3.   That the presiding justice erred in the rejection of certain evidence offered by the defendant, and in the admission of certain evidence for the plaintiff.

4.   That the presiding justice allowed improper cross-examination of defendant's witnesses.

5.   That the plaintiff's counsel misstated evidence in his arguments to the jury.

6.   That the presiding justice erred in his instructions and refusals of special instructions to the jury.

The conclusions of the jury that the apparatus produced in court as defendant's Exhibit A includes the identical burner, valve, and stem which were operated by the plaintiff at the time of the accident, and that the accident was not caused by an explosion, are amply supported by the evidence. Indeed, it may be said that there is no evidence to the contrary. The arrangement of the pipe with respect to the oil tank would seem to preclude the possibility of gas getting into the pipe from the tank, and the stem itself shows that the thread has never been stripped by any explosion. But when the correctness of these findings is conceded it leaves the general verdict with very little to stand upon. It must rest solely upon the proposition that the thread on the stem of the middle valve in Exhibit A was in some way so defective as to be unable to withstand the ordinary pressure of the oil in the pipes when the stem had been unscrewed three turns. This pressure was not more than forty pounds to the square inch, or to the area of the head of the stem not more than six pounds. It took eight and one-half turns to separate the male and female threads, so that after the third turn there were five and one-half rounds of the threads still in contact. The threads engaged each other, according to the evidence as interpreted by the plaintiff's counsel, one · one-hundreth of an inch, so that the bearing surfaces resisting the outward pressure of the oil were equivalent to a rim the thickness of the thread extending around the stem once, and fifty-five one-thousandths of an inch wide, or to a rim five and one-half times the thickness of the thread and one one-hundredths of an inch wide. It is apparent upon the mere statement of these dimensions that the stem was not forced out, by the ordinary pressure of the oil, when it had been unscrewed only three turns; but the defendant showed by uncontradicted evidence that an engagement of five one-thousandths of an inch between a stem and valve like the one in question was sufficient to resist the utmost force which a strong man could exert, and that threads of similar bearing surface to those of Exhibit A sustained without injury, in one case, a direct pull of 1,000 pounds, and in another experi-

ment, which was carried on till the stem broke, a pull of 2,970 pounds.

The only evidence that it was blown out and not unscrewed is that of the plaintiff, and it is not unreasonable to suppose that, after the terrible experience he went through, his recollection of the events which immediately preceded the accident should be uncertain. Certainly his recollection in the premises can not be accepted against an apparent impossibility. No one can examine the exhibit in its present condition, place it in the adjustment stated by the witness, test by pulling the holding power of the threads, and believe that they were ever forced apart by a pressure of six pounds. But if they were not, the strongest argument of the plaintiff in support of his claim that the defendant was negligent in providing unsafe apparatus falls to the ground. He cites a previous occasion when by a blow with a hammer upon the cross-piece the stem was disengaged from the valve and was blown or fell out. The incident is wholly without a bearing on the question of safety, because the witness can not testify how nearly the stem had been unscrewed when he gave it the additional revolutions needed to disengage it. The fact as it appears in evidence is simply that the stem was revolved an uncertain degree by a stroke upon the cross-bar. The cross-bar was placed there for the purpose of rotating the stem, and whether the pressure of the hand or the force of a blow were applied to it was immaterial. It was no more unsafe because it could be turned by a blow than because it could be turned by the hand.

The other reasons for considering the device unsafe appear on careful examination to be equally groundless. Thus the assertion is made in plaintiff's brief that "the very same type of valve stem in use in other establishments, when kept in ordinary working condition, can not be removed without using a wrench to separate the valve and exerting great force in pulling out the stem." The evidence on this point is that in ordinary practice when a workman desires to inspect or remove the stem he unscrews the packing-box, which requires the use of a wrench, not because he can not remove the stem by screwing it out through the packing, but because if it were

so taken out the packing would be injured and the workman would have the trouble of repacking the valve. So of the difficulty of withdrawing the stem when properly packed it is said that great force must be exerted for that purpose; but the evidence is absolutely confined to a direct pull, no difficulty whatever is experienced in continuing the rotary motion and releasing the stem from the packing in the same manner that it is released from the threads of the valve.

Again, the statement that the stem was injured by being hammered upon while in the valve is unsupported. The evidence is apparently conflicting as to the fact that the end of the stem was upset by blows of a hammer while the stem was in the valve in the process of replacing the wheel, which had originally served as a handle, with the transverse bar of iron affixed by Laforge. The testimony of Flynn is that four or five months before the accident the wheel had become loose and Laforge shaped the bar of iron, cut a square hole in it, fitted it upon the square end of the stem and headed the stem over with light blows of a hammer. Laforge himself says that he fitted the bar upon the end of the stem while it was screwed tightly in, then by means of the cross-bar unscrewed the stem, then took it to a vise, and, while it was there held, did the upsetting of the end so as securely to rivet the bar in place. He is corroborated by marks upon the stem such as would be made upon a softer metal by the jaws of a vise, between which it was tightly held. The conflict of evidence is unimportant, for if the hammering was done while the end of the stem was resting solidly in its groove it would have had no effect upon the threads; and also, inasmuch as the threads do not show any distortion or effect of transverse strain, it is doubtful whether the riveting was done while the stem was in place, and certain that if so done no injury resulted, for if hammering was done it might possibly have jarred the packing and caused a slight leakage.

The plaintiff relies finally on the opinion of two expert witnesses, Murphy and Turner, that the stem and valve were unsafe.

Mr. Murphy's testimony was to the effect that a checking

device is in common use upon valve stems which prevents the stem from being unscrewed from the valve without taking off the packing-box with it, and that a stem which is capable of being screwed completely out of the valve is an unsafe device to be furnished to workmen.

Mr. Turner testified to the same effect, and also that he considered this valve and stem unsafe because the engagement of the threads was so small.

Against the opinion of these witnesses the defendant produced fourteen expert mechanics, accustomed to the use of similar devices for burning oil, some of them men of national reputation, who said that in their opinion this valve and stem were in good and safe condition. As to the fact of adaptability to use, it further appears that one of the plaintiff's witnesses put the stem back into the valve directly after the accident, and it was used without difficulty for two weeks and then taken out to be kept as an exhibit.

The objection that the stem has no safety device is met by uncontradicted evidence that this type of burner was in common use, among others, by the Gorham Manufacturing Co., Nicholson File Co., Lonsdale Co., Silver Spring Bleachery, Glenlyon Dye Works, American Screw Compony, D. Goff & Sons, E. Jenckes, Mt. Washington Glass Co., Pairpont Manufacturing Co., Aspinook Bleachery, Taunton Oil Cloth Co., Norwich Dyeing and Bleachery Co., George Lawler & Co., Boston Bridge Co., Charles River Iron Works, United States Cartridge Co., Merrimac Manufacturing Co., Dominion Cotton and Woolen Co., Crawford Shoe Co., Winchester Arms Co.— all well-known, prudent, and careful business concerns in Rhode Island, Connecticut, Massachusetts, and Canada.

The evidence, therefore, very strongly preponderates against the verdict on every point urged to sustain it.

The objection to the allowance of more than a lawful number of challenges is not urged. Since this case was tried the question raised has been decided by this court in *Stevens* v. *Union R. R. Co.*, 26 R. I. 90, but error in this regard was held not to be such as to demand a new trial.

We may briefly refer to the defendant's exceptions to the rejection and admission of evidence.

The defendant urges that he should have been allowed to submit to plaintiff's witness McCool the burner valve and its accessories while he was testifying for the plaintiff. We think, inasmuch as McCool had described the valve and declared that he could identify it, it would have been proper to have allowed the test. McCool also had testified that he picked up the stem after the accident and put it back in the valve. It was proper cross-examination to ask him if the stem was in the valve when the furnace was next started.

(2) We think the court erred in allowing the plaintiff's witness Murphy to testify about plaintiff's Exhibit B. This was not a burner valve, and the evidence in relation to it could only tend to confuse the minds of the jury. It did not follow that because valves like Exhibit B were provided with a check-ring, the valve in question in the case was badly constructed, and the plaintiff's exhibit should not have been admitted for that purpose.

We think that the witness Murphy was sufficiently shown to be qualified as an expert to testify about oil controlling valves. As he had never used valves with crude oil, it was open to the defendant to show that his testimony did not apply to that class of valves, if such valves constitute a distinct class.

We think it was proper to ask the same witness how much pressure to the square inch would be required to blow out from its valve a valve stem such as witness was describing. The witness had stated his opinion that such a device was dangerous, and it was fair cross-examination to test the elements of which his judgment was made up. If he could not tell, the defendant was entitled to hear him say so. We think any person slightly acquainted with the mechanical forces would be qualified to answer the question, "What effect would pounding have on a stem while in the valve?" Evidently if the stem were part way in, the threads resting against each other, it would have a tendency to strip the thread, as the witness answered.

The question whether the witness had seen in common use

an oil burner without a checking device was proper; the extent of his knowledge of such burners being proper also in cross-examination. The question called for a fact of observation, not for the opinion of an expert.

The criticism of the manner of cross-examination of defendant's witness Laforge is not clearly supported by the record; the witness was certainly confused, and the effect of his testimony was diminished by his answers with regard to his former testimony; but whether his imperfect memory or natural obtuseness or infelicity of expression were not more to be blamed than the questions of the opposing counsel may be doubted. The matter is one of minor importance compared with the other questions in the case, and, as these questions are decisive of the petition, it seems to us unnecessary to pursue the exception through the twelve or fourteen pages of the record to which it relates.

It may also be sufficient to say of the fifteenth exception, which details alleged misstatements of evidence in the argument of plaintiff's counsel to the jury, that, having already found the verdict to be against the evidence, we need not inquire whether the jury were misled by the manner in which the evidence was presented to them in argument or by their own sympathy or prejudice.

(3)    The defendant introduced evidence of certain experiments made with stems and valves to show the effect of hammering upon the stem, and offered the stems and valves in evidence as exhibits. We see no reason why they should have been excluded. We think, however, that permission to perform experiments in the presence of the jury could not be demanded as a matter of right. The presiding judge might in his discretion grant or refuse such permission, being guided by the apparent importance and weight of the proposed experiment and the time it was likely to consume and other considerations connected with the conduct of the trial. We see no error in his refusal now excepted to.

Neither was it error to reject the defendant's offer to introduce an impression of the jaw of the vise in which it was alleged the valve stem in question was held while the cross-

bar was being riveted upon it. The stem itself bore an impression which witnesses testified was that of the vise-jaw; another impression proven to be such by the same or other witnesses would have added nothing to the case.

(4)    We find no error in the judge's modification of the defendant's first request to charge. The charge, as modified, was: "That defendant is not bound to furnish the safest or newest or any particular kind of burner or burner valve except such as are in common use *by ordinarily prudent and careful men and concerns under like circumstances*, and that if the jury find that the burner and burner valve used at the time of the accident was in use *by ordinarily prudent and careful people and concerns under like circumstances*, then it would not be negligent on the part of the defendant to put such a burner and valve in use. The addition of the words in italics is the only substantial modification of the defendant's request. There was another slight change in the language which could not, in our opinion, have borne the interpretation which defendant's counsel puts upon it. The request was to charge, "then the defendant was not negligent in using it." The concluding words of the charge as delivered, we think, mean the same thing.

The second request to charge was: "That if the jury find that the burner and burner valve used by the defendant at the time of the accident was then in good working condition, their verdict will be for the defendant." The court modified the request by inserting after the word "burner-valve" the words "with the pipe and connections." We think this was error, inasmuch as there had been no claim made or evidence introduced of any defect in the pipes and connections, but only in the valve and stem and the relation of these parts to each other.

The same addition was erroneously made to the next request to charge.

The fourth request was: "If the jury find that the accident was caused by the act of the plaintiff in screwing the stem out from the body of the valve, then their verdict will be for the defendant." The judge charged: "If the jury find that the

accident was caused by the act of the plaintiff in screwing the stem out from the body of the valve, *the valve and stem being in good working condition,* then their verdict would be for the defendant."

We think neither the request nor the modification was an adequate statement of the case. If the valve and stem were in good working condition the defendant was guilty of no negligence, and the plaintiff could not recover—whether he turned the stem out or not. If the valve and stem were defective the defendant was negligent, but if the plaintiff, knowing the fact and the danger, turned out the stem, he was guilty of contributory negligence. There are other elements which were necessary to be considered, in deciding the case, besides the simple act of turning out the stem. We do not think that it was the duty of the judge to decide upon the weight of evidence for and against these various contentions and to say categorically to the jury that in the circumstances of the case it was contributory negligence in the plaintiff, as a matter of law, to have turned out the stem. A judge sitting with a jury is not required to comment upon the evidence further then he may think it useful in assisting them to apply the law.

The petition for a new trial is granted, and the case will be remanded to the Common Pleas Division for further proceedings.

*John W. Hogan and Philip S. Knauer,* for plaintiff.
*William A. Morgan and Ratcliffe G. E. Hicks,* for defendant.